The bill of complaint was filed to cancel a life insurance policy on the ground of material misrepresentations. The policy was issued by the complainant insuring the life of James W. Chambers. The defendant is his widow and the beneficiary.
Complainant issued its policy in pursuance of an application signed by the insured on May 1st, 1947. The insured died July 10th, 1947, following an operation for the removal of a brain tumor.
The signed application for the policy contains the following provisions:
"It is understood and agreed that:
"1. The foregoing statements and answers are correct and wholly true and, together with the answers to part B hereof, shall form the basis of the contract of insurance, if one be issued.
"I hereby certify that: (1) I have read the answers to the questions in Part A and Part B hereof, before signing, (2) they have been correctly written, as given by me, (3) they are full, true and complete, and (4) there are no exceptions to any such answers other than as stated herein."
In Part B of the application, the insured was asked and answered as follows:
"11. Have you ever had any ailment or disease of (a) The Brain or Nervous System? No.
"12. (g) Have you consulted a physician for any ailment or disease not included in your above answers? No.
"13. What clinics, hospitals, physicians, healers, or other practitioners, if any, not named above, have you consulted or been treated by, within the past five years? If none, so state. None."
The complainant alleges that the foregoing representations were false in fact, material to the issuance of the policy and were relied upon by complainant in issuing its policy of insurance.
The evidence at the final hearing disclosed that the insured had been treated at his home by Dr. Wegrocki in 1943 upon the completion of the insured's boot training in the Navy. The doctor was called by the insured's father and the insured was found to be suffering from vomiting, convulsions and *Page 442 
numbness on the left side. Shortly thereafter, in November, 1943, the insured received a medical discharge from the Navy based upon his neurotic condition. Dr. Wegrocki testified that on January 27th, 1947, approximately three and one-half months prior to the insured's application for the policy, the insured had visited him and gave a history of chills, weakness, dizziness, sweating, hiccoughing, poor sleeping and numbness of the left side. Dr. Kallen, of the Veterans' Administration, testified that upon the insured's application for a pension he gave a history of headaches, dizziness, numbness of the right side and inability on one occasion to walk unaided. In addition, the insured told this physician that he had been confined to the Navy Hospital for nervousness and was discharged after only three months of service.
At the time of the insured's admission to the Newark Eye and Ear Hospital on June 16th, 1947, the following history was recorded and taken from the insured by Miss Stevens, an employee:
"While in service — during 1943 — he had been on a week's leave — and about 2-3 hours prior to the time he was to leave home to return to duties — he had his first spell of nausea — dizziness — blackout feeling.
"Since then these spells have been intermittent — becoming more frequent — and worse this past week —
"He gets terrific headaches seeming to start at back of neck and head — becoming temporal — "
On the same day the insured gave the following history to Dr. Ross of the Newark Eye and Ear Hospital:
"June 16. 3 1/2 years ago — November 1943 — first episode of faintness, turning and collapse without loss of senses but with left sides numbness and hiccoughing for 16 days. Subsequently frequent giddiness, lately nausea with it, weakness and dizziness. Frequent train sickness for 1 1/2 years before present illness."
The inference to be drawn from the foregoing evidence is that the insured well knew that his physical condition was impaired more seriously than he had stated in the representations made in the application for the insurance policy. True, he did state that he had been confined to the Naval Hospital in 1943 for a period of two weeks suffering from a nervous *Page 443 
stomach but concealed the fact that he had been given a medical discharge from the Navy and that for a period of three and one-half years he had been afflicted with a condition of dizziness, nausea and numbness which led him to consult various physicians. Had the insured revealed the knowledge of his physical history which he had and which the complainant in all fairness had a right to know, the policy would not have been issued.
The concealments were of material facts which affected the risk assumed by the complainant. Materiality has been defined inKerpchak v. John Hancock Mutual Life Insurance Co.,97 N.J. Law 196, 198, as follows:
"Every fact which is untruly stated or wrongfully suppressed must be regarded as material, if the knowledge or ignorance of it would naturally and reasonably influence the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium."
It may well be that the insured did not intend to perpetrate a fraud upon the complainant in the procurement of the policy. In equity, however, it is not necessary that the complainant prove an intent to deceive in order to be successful. The rule in equity is that "an untruthful representation of a material fact, though there be no moral delinquency, is deemed to be fraudulent." Commercial Casualty Insurance Co. v. SouthernSurety Co., 100 N.J. Eq. 92; affirmed, 101 N.J. Eq. 738. "At law, moral fraud must be shown to have been present in the misrepresentation (Cowley v. Smyth, 17 Vr. 382); in equity the complainant must succeed, although the misrepresentation was innocent." Metropolitan Life Insurance Co. v. Tarnowski,130 N.J. Eq. 1, 3.
I shall advise a decree granting the relief prayed for. *Page 444